UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DEBORAH WILSON, as Administratrix *ad Prosequendum* for the ESTATE OF MICHAEL WOOD, | : | Hon. Joseph H. Rodriguez |
| | : | Civil Action No. 13-5437 |
| Plaintiff, | : | OPINION |
| v. | : | |
| BOROUGH OF BELLMAWR, BOROUGH OF BROOKLAWN, CHARLES HOLLAND, CHRISTOPHER CUMMINGS, JEFFREY VANCE, and CHRIS WILHELM, | : : : | |
| Defendants. | : | |

This matter is before the Court on Defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. [Doc. 54 & 55.] The Court heard oral argument on the motions on August 9, 2016, and the record of that proceeding is incorporated here. For the reasons outlined below, the motions will be granted in part and denied in part.

## **Jurisdiction**

This case is a civil action over which the district court has original jurisdiction based on a question "arising under the Constitution, laws, or treaties of the United States." See 28 U.S.C. § 1331. Plaintiff, the Aministratrix and Administratrix *ad Prosequendum* for the Estate of her brother Michael Wood, asserts a violation of the Decedent's civil rights

1

pursuant to 42 U.S.C. § 1983. With respect to Plaintiff's state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

## Background

On the night of April 26, 2012, police officers from both Bellmawr and Brooklawn responded to a suicide call placed by Decedent Michael Wood, who was staying at the apartment of his brother, Chris Wood. Within approximately 15-20 minutes after officers arrived at Chris Wood's apartment, Defendant Brooklawn Police Officer Charles Holland shot Michael Wood twice in the torso. Michael Wood was transported by ambulance to the hospital, where he later died. The circumstances leading up to the shooting are disputed.

At approximately 9:19 p.m. on April 26, 2012, Bellmawr Police Department received a call from 911 central dispatch. (Pl's Exs. AA, P, Q, W1.) The dispatcher stated:

> Bellmawr Manor Apartment, Apartment 163 [in the Borough of Bellmawr], there is an attempted 16 dispatch for a psyche emergency . . . its gonna be for a male . . . who keeps hanging up on the call taker . . . says she [sic] keeps saying he wants to commit a 10-74 we have no means at this time.

(Pl's Ex. AA.)

Defendant Bellmawr Sergeant Jeffrey Vance was the first to respond to the scene, along with Defendant Holland. (Pl's Ex. W1; W3; Vance Dep.

2

p. 8, 38; Holland Dep. p. 101-02.)[1] Sergeant Vance was, at all relevant times, the supervising officer in charge of the scene. (Vance Dep. p. 8, 13, 20, 41; Holland Dep. p. 31; Cummings Dep. p. 29; Wilhelm Dep. p. 29-31.)

Defendants Vance and Holland repeatedly knocked on the door, and rang the doorbell to Chris Wood's apartment (apartment 163), but received no answer. (Pl's Ex. W1; W3; Vance Dep. p. 39; C. Wood Dep. p. 40.) The officers saw no lights on in the apartment, which was located on the second floor of the two-story apartment building. (Pl's Ex. W1; W3) At that time, the officers did not announce that they were police. (Pl's Ex. W1; Christopher Wood Dep. p. 40.)

Defendant Vance radioed dispatch, and then dispatch made two phone calls, the order of which is not clear in the record. Dispatch unsuccessfully attempted to call the apartment complex's maintenance number to reach someone with a key to the apartment. (Pl's Ex. W1; W3; Vance Dep. p. 39.) Dispatch also called back the number from which they had received the 911 calls. The call went straight to the caller's voicemail. The transcript of the call states:

> Voice Message[:] Hi, it's Chris Wood I'm dead . . . You probably got the wrong number. At the tone please . . .

---

[1] Brooklawn and Bellmawr are among several municipalities which share the same radio frequency and have mutual aid agreements, allowing officers from neighboring municipalities to respond to each other's calls. (Walsh Dep. p. 37-39; McKinney Dep. p. 25; Holland Dep. p. 10.)

(Pl's Ex. AA.)

Defendant Vance testified that what dispatch relayed to him about the message was slightly different. Vance testified, "[dispatch] told me they attempted the phone number who had placed the call and it went straight to voice mail and the voice mail indicated that – I have to review my notes – I can't come to the phone because I'm dead." (Vance Dep. p. 40.)

Defendant Holland testified that he also heard dispatch over the radio: "the dispatcher came across the air stating that they called the phone and it said – and the voice mail stated something—I'm not going to remember verbatim – but it was something to the effect of this is Michael Wood, I am now deceased." (Holland Dep. p. 30.)

Defendant Vance then decided to make a forced, warrantless entry into the apartment by breaking a small glass window pane immediately to the right of the lock on the door. (Vance Dep. p. 41.) When Vance's initial attempt to break the glass failed, Defendant Holland broke the glass with his flashlight and opened the door. (Vance Dep. p. 41; Holland Dep. p. 29-30; Pl's Ex. W3.)

By this time, Defendants Bellmawr Police Officers Cummings and Wilhelm had arrived on the scene to assist Defendants Vance and Holland.

(Vance Dep. p. 42; Wilhelm Dep. p. 32-38; Cummings Dep. p. 24-25; Holland Dep. p. 52-53; Pl's Ex. P, Q.)

Together, the four officers announced themselves as police officers and began to ascend the stairs to the second-floor apartment. (Holland Dep. p. 52; Cummings Dep. p. 26-27; Wilhelm Dep. p. 38-39; C. Wood Dep. p. 45-46.) Defendants Vance and Holland led the way, followed by Cummings, then Wilhelm. (Vance Dep. p. 42-43; Wilhelm Dep. p. 39; Cummings Dep. p. 26; Pl's Ex. W1.) The stairway was unlit and narrow, although the television was on in the living room at the top of the stairs. (Cummings Dep. p. 26-27; Wilhelm Dep. p. 38; C. Wood Dep. p. 44.) Holland drew his service weapon, and used the flashlight mounted on the gun to provide light. (Pl's Ex. W3; Holland Dep. p. 72) Cummings also drew his weapon. (Cummings Dep p. 27.) Vance used a traditional flashlight to illuminate the steps (Vance Dep. p. 42; Pl's Ex. W1); he could not recall whether he also drew his weapon, (Vance Dep. p. 43).

As the officers were moving up the stairs, a man, later identified as Chris Wood, appeared at the top of the stairs. (Holland Dep. p. 52; Vance Dep. p. 44; Cummings Dep. p. 27.) Chris Wood testified that he had been sleeping on the pull-out couch in the living room after a day of heavy

drinking. (C. Wood Dep. p. 33, 40, 63; Pl's Ex. Y.)[2] One of the officers handcuffed Chris Wood at the top of the stairs without incident. (Vance Dep. p. 45; Holland Dep. p. 53; Cummings Dep p. 28-29; Pl's Ex. Q.)

As Chris Wood was being handcuffed, the officers heard Michael Wood towards the back of the apartment, say "something to the effect that's my brother, I'm back here. Leave him alone," (Holland Dep. p. 28; Pl's Ex. W3), or "he's not the one you want. I'm the one that called," (Vance Dep. p. 46), or "it's not him you want. You're here for me or looking for me," (Wilhelm Dep. p. 66), or "something of it's not him. You're here for me," (Cummings Dep. p. 30).

Defendants Cummings and Wilhelm then led Chris Wood to the ambulance waiting outside. (Cummings Dep. p. 28; Wilhelm Dep. p. 62.) In the ambulance, Cummings unhandcuffed Chris Wood and attempted to get information about the situation but "Chris was very hard to follow because he was extremely intoxicated . . . and was just bouncing all over the place with everything he said." (Cummings Dep. p. 31.) Wilhelm left Cummings and Chris Wood to return to the apartment. (Wilhelm Dep. p. 63.)

---

[2] Approximately two hours after the shooting, Chris Wood gave a statement to the Camden County Prosecutor's Office wherein he stated that he drank eight 24-ounce cans of beer, and five shots of vodka that afternoon. (Pl's Ex. Y.)

Meanwhile, Defendants Vance and Holland moved further into the one-bedroom apartment[3], which was mainly dark, save for one small ceiling light. (Holland Dep. p. 99; Pl's Ex. W3.) As Vance and Holland moved towards the direction of the voice, Holland—who was ahead of Vance—looked through the open bedroom door and, from about 20 feet away, (Pl's Ex. W1), saw Michael Wood sitting "Indian-style" on the floor holding a "large knife," (Holland Dep. p. 33, 74; Vance Dep. p. 47).[4] Holland testified that Michael Wood "was kind of twisting [the knife] into his upper thigh area." (Holland Dep. p. 74.)[5]

Around this time, Defendant Wilhelm rejoined Defendants Vance and Holland and also observed Michael Wood sitting on the bedroom floor. (Wilhelm Dep. p. 135) Wilhelm testified,

Q: What was [Michael Wood] doing?

A: Sitting.

---

[3] The apartment complex's floor plan indicates that the apartment had roughly 500 square feet of living space. (Pl's Ex. M1.)

[4] The autopsy report for Michael Wood indicates that on the night of the shooting, Michael Wood was 37 years old; six feet, one inches tall; and weighed 267 pounds. (Pl's Ex. S2.) He was wearing a tank top undershirt, size 40 x 32 jeans, and size 13 sneakers. (Id.; Pl's Ex. S1; Holland Dep. p. 64.)

[5] The knife later recovered at the scene was a "brown-handled Winchester brand knife. . . . The total length of the knife was approximately fourteen inches (14"), with the blade length being approximately eight and a half inches (8 ½")." (Pl's Ex. S1.)

Q: Did you perceive him to be a threat at that time?

A: No.

. . .

Q: While he was sitting there in the bedroom did you observe any knives or other weapons?

A: No.

(Wilhelm Dep. p. 135-36.)

Defendants Holland and Vance had their weapons drawn; Holland's weapon was pointed at Michael Wood. (Pl's Ex. W1.)

Defendant Holland began to speak with Michael. Holland testified,

I started asking him general questions like, hey, what's your name? Tell me what is wrong. I'm here to help and [I was] met with, you know pretty much resistance. He was not telling me anything. . . . [A]t one point he told me its none of my business.

I asked him . . . what do I have to do to get you to put down that knife and . . . he just would repeat something to the effect I just want you to fucking kill me or I just want you to kill me or I just want to die.

That dialogue went on for a little bit. Then he started telling me – he started getting upset and saying – he was kind of rambling about he didn't get to see his kids. . . . I asked him how many kids he had, what are their names. . . .

[He] mentioned at one point about how both his parents had passed; mentioned how in general his life hadn't gone right. He didn't have a steady job. He was broke. . . .

[H]e mentioned something about he had never been married yet and he lost his girl . . . and I tried to lighten the mood with him and I made a joke. I said, well, listen, I've

> been divorced so that—you know chalk that one up in the win column and he actually laughed when I said that, so that kind of led me to believe he was coming around a little bit. . . .
>
> I asked him can I have the knife, can you lay down that knife for me—he reached over and grabbed another [smaller] knife[6] and . . . threw it out the [bedroom] door at me and it landed next to my boot. . . . I said thank you. . . but I need you to put the big one down and how many—I said do you have any other knives? . . . I believe he said he had like five or six other knives with him.

(Holland Dep. p. 70, 74-76.)

Defendant Vance similarly testified,

> [Defendant Holland said to Michael Wood] that we wanted to get him some help and he needed to drop the knife; that we wanted to take him out. He wasn't in trouble. We just wanted to get him somewhere he could have some help and talk to somebody. . . .
>
> At one point Michael said that the only way you can help me is to kill me.

(Vance Dep. p. 50-51.)

Defendants Holland and Vance's testimonies diverge, however, as to Michael Wood's demeanor. Holland testified at his deposition that Michael was "agitated," and "fluctuated" between "depression, . . . anger,

---

[6] Beside the Winchester, the other knife later recovered at the scene was a "black-handled Royal Norfolk Cutlery brand knife [with] a total length of eight and a half inches (8 ½")," with the blade length being approximately four and a quarter inches (4 ¼")." (Pl's Ex. S1.) Defendants Holland and Vance both characterized it as a "steak knife." (Pl's Exs. W1, W3.) No other knives were collected from the apartment. (Pl's Ex. S1.)

excitement. He kind of ran the gamut of emotions." (Holland Dep. p. 69.)

Holland also told the Camden County Prosecutor, "you could see . . . he

[was] agitated[.] [Y]ou could just tell in his whole demeanor . . . his actions

were quick and jerky." (Pl's Ex. W3.)

Vance, on the other hand, testified,

Q: . . . Did [Michael Wood] seem calm the entire time?

A: Yes. He didn't seem agitated at all.

Q: Was he ever yelling at any point while you were in the
apartment?

A: No.

(Vance Dep. p. 67.)

It is undisputed that Michael Wood "never talked about killing

anyone else or harming anyone else." (Vance Dep. p. 66.)   The conversation

between Defendant Holland and Michael Wood lasted "approximately four

to five minutes," (Vance Dep. p. 51), and then Michael Wood "shut" or

"closed" -- not "slam[med]"—the bedroom door, (Vance Dep. p. 53;

Wilhelm Dep. p. 137).[7]

At this point, the encounter had evolved into a "barricade" situation

and, accordingly, Defendant Vance radioed to have the Zone 5 Critical

---

[7] Defendant Holland told the Camden County Prosecutor that Michael
Wood "slam[ed]" the door. (Pl's Ex. W3.)

Incident Team (a SWAT team), dispatched to the scene. (Vance Dep. p. 34, 53-54, 78; Holland Dep. p. 21-22, 24; Wilhelm Dep. p. 68-69; Pl's Ex. P.)

Defendant Wilhelm, at Defendant Vance's direction, left the apartment and, from the ground, "covered" the open window of the bedroom where Michael was barricaded. (Pl's Ex. P; Wilhelm Dep. p. 23.)

Defendants Vance and Holland remained where they were in the apartment while waiting for the Critical Incident Team to arrive.  While they were waiting, Defendant Holland was still trying to speak with Michael through the closed door when Michael "asked to speak to [his brother], Chris." (Vance Dep. p. 55.)[8] Vance testified, "I agreed to [bring in Chris] in hopes to talk [Michael] out of the bedroom." (Vance Dep. p. 53.)

Defendant Vance radioed to Defendant Cummings to "escort[] [Chris] back to the apartment to speak with his brother." (Cummings Dep. p. 34.) Cummings brought Chris back into the apartment and sat him down on the landing at the top of the stairs. (Id.; Pl's Ex. Q.) Vance "attempted to coach [Chris] in what to say to try to calmly have Michael come out of the bedroom," (Vance Dep. p. 56; see also Cummings Dep. p. 36), but Chris was "intoxicated," (Vance Dep. p. 55; Cummings Dep. p. 36), and it quickly

---

[8] Defendant Holland told the Camden County Prosecutor that Michael "start[ed] getting very belligerent . . . demanding his brother." (Pl's Ex. W3.)

became apparent to the officers "that it wasn't going to work," (Vance Dep. p. 56). Within "a minute or . . . two," "[the conversation] became an argument," (Cummings Dep. p. 35-36), with Chris telling Michael "to stop acting like this and just come out," and "calling Mike names," (Vance Dep. p. 57, 56). Then Chris said to Michael, "look at that cop he's pointing a gun at you[.] He's gonna fucking kill you." (Pl's Ex. W3.)

> Holland testified,
>
> Chris was kind of rambling and Michael then eventually talked over him and said just like something to the effect, Chris shut up. I want to tell you something. I just want to say good bye.

(Holland Dep. p. 77.)[9]

Defendant Cummings--at Defendant Vance's direction--escorted Chris back out of the apartment and stood with Chris on the grass. (Cummings Dep. p. 36-37; Vance Dep. p. 56; Pl's Ex. Q.)   "A minute or two" after Chris left the apartment, Michael opened the bedroom door. (Vance Dep. p. 58; Pl's Ex. W1.) Defendants Holland and Vance both testified that Michael was "holding" or "palming" the large knife vertically with the handle closest to the floor and the blade pointing up, running

---

[9] Chris Wood has no memory of being brought back into the apartment, nor of having a conversation with his brother. (C. Wood Dep. p. 48-49.)

along his forearm. (Holland Dep. p. 79-80; Vance Dep. p. 52.)  Both officers

pointed their guns at Michael. (Vance Dep. 58, 65; Pl's Ex. W3.)

As to what happened next, the testimonies of Defendants Holland

and Vance materially differ.  Holland testified:

> [Michael] is coming down the hallway, and I'm yelling to
> him . . . Michael let's not do this. Come on. We're doing
> good. . . . [Then] he raised the knife up. He took a large
> advancing step towards me, and then he pivoted towards
> Sergeant Vance. . . . As he continued his advance . . . I'm
> yelling at him drop the knife. . . . Michael takes a step, like
> half a step forward, leans forward, and I see his sight go
> towards where Sergeant Vance is standing on the wall. With
> that he leans back. He takes the knife and passes it around
> his own back to his right hand. . . . The blade is . . . pointing
> forward. . . . He had the knife up and he pivoted towards
> Sergeant Vance and that's when I fired.

(Holland Dep. p. 79-83.) Holland also told the Camden County Prosecutor:

> Now I'm screaming . . . drop the knife . . . drop the knife . . .
> [Michael] hesitates for a couple seconds and then he takes
> a large step and brings the knife out up to . . . you know in
> horror movies you see like when the guy brings it up to his
> shoulder like he's ready to stab somebody[,] that's what he
> does. He brings it up . . . shoulder height . . . and he's looking
> at me but as he takes a step he starts to rotate towards
> Sergeant Vance so that's when I fired two shots.

(Pl's Ex. W3.) Holland estimates that Michael was "eight feet [away] . . .

twelve feet at the most" when Holland fired his gun. (Id.)

On the other hand, Vance testified, "[a]s soon as Michael exited the

bedroom Officer Holland was ordering him to drop the knife, drop the

knife. . . . [Michael] was moving forward," (Vance Dep. p. 62), "walking out

of the bedroom," (Pl's Ex. W1). "[H]e started to advance towards Officer

Holland," (Vance Dep. p. 59), "continued to walk toward both [Holland]

and myself," (Pl's Ex. W1). Vance further testified:

Q: . . . [w]here was the knife pointed?

A: Still held the same way with the blade up his arm.

Q: Was his arm down, in a downward position?

A: Yes.

Q: Was his arm in a downward position when Officer
Holland fired his weapon?

A: Yes.

Q: How far was Michael from Officer Holland when he fired
his weapon?

A: Six, maybe seven feet.

Q: How far was he from you?

A: About the same.

Q: When Officer Holland fired his weapon what direction
was Michael facing?

A: He was facing towards Officer Holland.

. . . .

Q: Did [Michael] ever make a turn towards you?

A: Not that I am aware of.

. . . .

Q: Did [Michael] ever wave the knife at either of you; either you or Officer Holland?

A: No.

Q: Never pointed the tip of it at you?

A: No.

Q: . . . Did he ever wave it in a threatening manner?

A: No.

(Vance Dep. p. 60, 66.)

After Michael was shot, EMS carried him out of the apartment on a stretcher and transported him to the hospital. He was pronounced dead at 10:52 p.m. (Pl's Ex. S1.) The autopsy report indicates the cause of death was "multiple gunshot wounds." (Id.)

Defendants Holland and Vance testified that they received no training on how to deal with barricaded or suicidal subjects. (Vance Dep. p. 16-19; Holland Dep. p. 36, 92.) Representatives from both the Bellmawr Police Department and the Brooklawn Police Department testified that their departments do not provide any training on how to deal with barricaded or suicidal subjects, and have no formal policies concerning such subjects. (Walsh Dep. p. 11, 13-14, 60; McKinney Dep. p. 23-24, 46.) Officers are expected to rely on their "experience" in such situations. (Walsh Dep. p. 14; McKinney Dep. p. 23.)

Plaintiff submits a "Training Key" published in 2007 by the International Association of Chiefs of Police specifically highlighting the need for training and "pre-planning" for situations involving barricaded and suicidal subjects. (Pl's Ex. N.) With respect to the use of deadly force against barricaded and suicidal subjects, the Training Key states, "it is essential that both [patrol personnel and negotiators] train together on a regular basis. Realistic practical exercises emphasizing all appropriate operational aspects and coupled with periodic discussions of past incidents should be considered mandatory." (Id.)

The Complaint asserts eight counts: (1) Monell liability of the Defendant municipalities; (2) use of excessive deadly force and state created danger in violation of the Fourth and Fourteenth Amendments against the Defendant officers in their individual capacities; (3) wrongful death; (4) survival action; (5) negligence; (6) *respondeat superior*; (7) negligent entrustment; and (8) negligent hiring and retention.

## Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56

(a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand

17

a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## Discussion

### 42 U.S.C. § 1983

Plaintiff's Constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). Any analysis of 42 U.S.C. § 1983 should begin with the language of the statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See 42 U.S.C. § 1983.

As the above language makes clear, Section 1983 is a remedial statute designed to redress deprivations of rights secured by the Constitution and its subordinate federal laws. See Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979). By its own words, therefore, Section 1983 "does not . . . create substantive rights." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Baker, 443 U.S. at 145, n.3).

To state a cognizable claim under Section 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)). Thus, a plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that plaintiff was deprived of his rights by a person acting under the color of state law. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

## Municipal Liability

A municipality is not liable under 42 U.S.C. § 1983 on a *respondeat superior* theory. Monell v. Dept. Soc. Servs. of New York, 436 U.S. 658, 691 (1978). However, a government entity may be liable for its agent's actions upon a demonstration that a policy or custom of the municipality caused, or was a "moving force" behind, the alleged violation of Plaintiff's rights. Kentucky v. Graham, 473 U.S. 159, 166 (1985) (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). Thus, in order to prevail against the government entity, "[a] plaintiff must identify the challenged policy, attribute it to the city

itself, and show a causal link between execution of the policy and the injury suffered." Losch v. Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984).

Policy is made when a decisionmaker with final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990). A course of conduct or practice is considered custom when, though not authorized by law, such practices are "so permanent and well-settled as to virtually constitute law." Id. To impose municipal liability pursuant to a custom, a plaintiff must show that the municipality acted with "deliberate indifference" to its known or obvious consequences. City of Canton v. Harris, 489 U.S. 378, 388 (1989); Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 397, 398 (1997). See also Berg v. Cty. of Allegheny, 219 F.3d 261, 277 (3d Cir. 2000) (this can be shown if it is obvious that a custom would lead to constitutional violations). "A showing of simple or even heightened negligence will not suffice." Brown, 520 U.S. at 407.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 563 U.S. 51, 61 (2011). "Where the policy 'concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to

'deliberate indifference' to the rights of persons with whom those employees will come into contact.'" Thomas v. Cumberland Cty., 749 F.3d 217, 222 (3d Cir. 2014) (quoting Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (quoting Canton, 489 U.S. at 388)). "'[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" Thomas, 749 F.3d at 223 (quoting Brown, 520 U.S. at 410).

"Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." Thomas, 749 F.3d at 222 (quoting Canton, 489 U.S. at 391). "[T]he causation inquiry focuses on whether 'the injury could have been avoided had the employee[s] been trained under a program that was not deficient in the identified respect.'" Id.

While deliberate indifference ordinarily requires a pattern of constitutional violations resulting from a lack of training, in certain situations, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." Canton, 489 U.S. at 390 n.10. "Liability in single-incident cases depends on '[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that

situation will violate citizens' rights.'" Thomas, 749 F.3d at 223-24 (quoting Brown, 520 U.S. at 409). "The high degree of predictability [in a single incident case] may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." Brown, 520 U.S. at 409-10. See also Connick, 563 U.S. at 63-64 (stating that "single-incident liability" applies only in "narrow range of circumstances" where "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations" (citing Canton, 489 U.S. 378)).

Finally, a plaintiff cannot seek to hold a municipality liable for damages where the officer has inflicted no constitutional harm. Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 217 n.12 (3d Cir. 2009) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). Therefore, before addressing deliberate indifference and causation, a court must first address whether there was a constitutional violation at all. See Grazier, 328 F.3d at 124 ("municipal liability requires constitutional harm"); cf., Thomas, 749 F.3d at 223 ("The parties do not challenge the existence of . . . a constitutional violation on appeal.").

Moreover, the United States Supreme Court has held that "neither a State nor its officials acting under their official capacities are 'persons' under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

As such, an employee of the state named as a defendant in a civil rights action may be held liable only if that person has personal involvement in the alleged wrongs and is sued in their personal capacity. See Hafer v. Melo, 502 U.S. 21, 31 (1991) ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983").

## Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the

need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. Id. (internal quotation omitted). Properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 5623 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (3d Cir, 2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. Id. (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley, 475 U.S. at 341. See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of the official was reasonable at the time it occurred.).

Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant. <u>See</u> <u>Beers-Capital v. Whetzel</u>, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

## **Fourth Amendment**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

A Fourth Amendment excessive force claim calls for an evaluation of whether police officers' actions are objectively reasonable[10] in light of the facts and circumstances confronting him. <u>Graham v. Conner</u>, 490 U.S. 386,

---

[10] While the question of reasonableness is objective, the court may consider the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396. In a claim for excessive force, "the central question is 'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992)). Furthermore, appropriate attention should be given "to the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 (3d Cir. 1995) (quoting <u>Graham</u>, 490 U.S. at 396). <u>See also</u> <u>Graham</u>, 490 U.S. at 396-97 (analyzing reasonableness of use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

397 (1989). "Whether or not [an officer's] actions constituted application of 'deadly force,' all that matters is whether [the officer's] actions were reasonable." Scott v. Harris, 550 U.S. 372, 383 (2007). The reasonableness of a seizure is assessed in light of the totality of the circumstances. Abraham v. Raso, 183 F.3d 279, 289 (3d Cir. 1999).

## Official Capacity Claims

To the extent that Plaintiff has sued the Defendant police officers in their official capacities, summary judgment must be granted because these are really claims against the police department and, in turn, the municipality. See Hafer, 502 U.S. at 25 ("official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). Accordingly, the Court is left with the claims against the officers in their individual capacities.

## Officer Holland's use of deadly force

The Decedent in this case, unlike many deadly force cases, was not a suspect, nor a fleeing felon. The Defendant officers in this case responded to Michael Wood's own suicide call, and once on the scene, the officers were undisputedly attempting to help the Decedent, not investigating a reported crime, nor effectuating an arrest. Nonetheless, the Garner deadly force analysis applies. See Connor v. Thompson, 647 F. App'x 231, 237 (4th Cir. 2016) (applying Garner to deadly force used on a suicidal subject);

27

Weinmann v. McClone, 787 F.3d 444, 448 (7th Cir. 2015) (applying Garner to deadly force used on a suicidal subject); Glenn v. Washington County, 673 F.3d 864, 876 (9th Cir. 2011) (applying Garner to deadly force used on a suicidal subject, and explaining "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual").

The Court therefore proceeds with a qualified immunity analysis regarding Officer Holland's use of deadly force. First, Michael Wood's right to be free from excessive, deadly force was clearly established on the night of the shooting. "It has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others. In short, the dispute in this case is about the facts, not the law. The doctrine of qualified immunity is therefore inapposite." Lamont, 637 F.3d at 185; see also Connor, 647 F. App'x at 239 ("Garner . . . constitutes sufficient notice to bar qualified immunity in this case."); Weinmann, 787 F.3d at 450 ("Graham and Garner stand for the proposition that a person has a constitutional right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else. The court of appeals cases

are even more specific: they say that officers may not use deadly force against suicidal people unless they threaten harm to others, including the officers.").

Next, the Court turns to whether Holland's use of deadly force was objectively reasonable, given the totality of the circumstances. If Holland's version of events is found credible by a fact-finder, there was no constitutional violation; Michael Wood took "large advancing steps" toward Holland and Vance, while holding a large knife over his shoulder "like he's ready to stab somebody," and ignoring repeated commands to drop the knife. (Holland Dep. p. 79-83; Pl's Ex. W3.) These facts, if found true, would compel the conclusion that Holland acted reasonably with the belief that Michael Wood posed a significant threat of death or serious physical injury to either Officer Holland or Sergeant Vance. See Abraham, 183 F.3d at 280 ("'Detached reflection cannot be demanded in the presence of an uplifted knife.'") (quoting Brown v. United States, 256 U.S. 335, 343 (1921)).

Critically, however, Holland's is not the only version of events in the record. As already stated, Sergeant Vance's version of events is quite different. According to Vance's account, Michael Wood never raised the knife, nor waved the knife, nor pointed the knife in the officers' direction. He merely palmed the knife at his side, with the blade running along his

forearm as he walked -- not ran or charged – toward the officers. If this version is found to be true, then a reasonable juror could find that a constitutional violation did occur.

This case is analogous to <u>Connor v. Thompson</u>, where the Fourth Circuit recently affirmed, in a deadly force case, the district court's denial of qualified immunity at summary judgment based on disputed issues of material fact. 647 F. App'x 231 (4th Cir. 2016). In <u>Connor</u>, the defendant officer also responded to a 911 suicide call. 647 F. App'x at 233-34. When the officer arrived at the house, he was escorted by the decedent's uncle into an entrance foyer with a four-step stairwell leading to the living room where the decedent was waiting. <u>Id.</u> at 234. As the decedent "was about halfway down the four stairs" the officer saw that the decedent was holding a paring knife. <u>Id.</u> The officer "drew his gun and told [the decedent] to drop the knife. The command was repeated several times . . . but [the decedent] did not comply. When [the decedent] reached the bottom of the stairs, [the officer] fired twice, killing him." <u>Id.</u>

The Court of Appeals affirmed the district court's denial of qualified immunity, explaining,

> [v]iewing the record in the light most favorable to the Appellee, [the decedent] possessed a paring knife, refused to comply with repeated commands to drop the weapon, continued down the stairs (and thus closer to [the officer]) rather than stopping. As for the knife, we have held the mere

> possession of a deadly weapon by a suspect is not enough to permit the use of deadly force. Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is threatened with the weapon. And while [the decedent] stubbornly maintained possession of his knife, the assumed circumstances [the officer] confronted do not establish that [the decedent] threatened anyone with it.
>
> For the present inquiry, the district court appropriately assumed [the decedent] never raised his knife, changed hands, or acted aggressively with it. We have held that holding a weapon in a non-threatening position while making no sudden moves fails to support the proposition that a reasonable officer would have had probable cause to feel threatened. [The officer], moreover, had been informed that [the decedent] was suicidal, which could have explained the reason for holding the knife.

Connor, 647 F. App'x 237-38 (internal citations and quotations omitted);

see also Weinmann v. McClone, 787 F.3d 444, 449 (7th Cir. 2015) (in a

suicidal subject deadly force case, affirming the district court's denial of

summary judgment observing, among other things, that "the way in which

[the plaintiff] was holding the gun is disputed.").[11]

---

[11] This case is therefore distinguishable from Lane v. City of Camden, 2015 U.S. Dist. LEXIS 127152 (D.N.J. Sept. 23, 2015), which Defendants rely upon. In that case, Judge Kugler specifically explained that the plaintiffs provided no affirmative evidence to contradict the officer's testimony that the decedent advanced on the officers with the knife raised. Id. at *21-23 ("In the absence of any affirmative evidence presented by Plaintiffs, this Court must conclude that there is no genuine dispute that Decedent advanced upon [the officers] with a knife, as Sergeant Price described at his deposition. As such, whether [the officers] acted reasonably in using deadly force . . . is a question of law to be resolved by this Court.")(Emphasis in original.).

Genuine issues of disputed fact prevent the Court from holding, at summary judgment, that Officer Holland is entitled to qualified immunity. Summary judgment will be denied on the Fourth Amendment claim in Count II based on Officer Holland's use of deadly force.

## <u>Sergeant Vance's and Officer Holland's use of excessive force</u>

Plaintiff asserts that by failing to vacate the apartment and wait for the Critical Incident Team to arrive and bringing Chris Wood into the apartment to speak with his brother, Sergeant Vance and Officer Holland needlessly escalated the situation, thereby precipitating the shooting. In other words, the officers "unreasonably created the encounter that ostensibly permitted the use of deadly force." See <u>Abraham</u>, 183 F.3d at 296 (quoting <u>Estate of Starks v.</u> Enyart, 5 F.3d 230, 234 (7th Cir. 1993) but leaving a decision on the issue in the Third Circuit "for another day"). This independent claim seems to be couched as both a Fourth Amendment violation and a Fourteenth Amendment violation under a State-created danger theory.

As to the state-created danger theory, <u>Graham v. Connor</u> appears to foreclose such a claim. 490 U.S. 386, 388 (1989) ("This case requires us to decide what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person. We hold that such claims

are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." Accord Abraham, 183 F.3d at 288 ("excessive force in the course of an arrest is properly analyzed under the Fourth Amendment, not under substantive due process") (citing Graham, 490 U.S. at 393-94).[12]

Viewing the facts in the light most favorable to Plaintiff, a jury could find unreasonable Holland and Vance's conduct in entering the apartment and continuing to confront the Decedent. See Morias v. City of Phila., 2007 WL 853811, *5 (E.D. Pa. Mar. 19, 2007) ("Decedent did not pose an immediate threat to the safety of the officers or others. Although Decedent was armed with a knife, he did not have the ability to harm any individual outside of his apartment, unlike [someone] who had a gun."). Holland and Vance responded to the apartment to protect the Decedent's well-being. Prior to their forced entry, there was no indication that he had harmed anyone. The officers knew that they were responding to an individual with a "psych emergency," yet they escalated the situation. Under the theory that the officers' actions unreasonably created the need for deadly force, it is possible Plaintiff could establish a violation of the Fourth Amendment.

---

[12] Further, the Court does not find that the officers' actions leading up to the shooting "shock the conscience." See Bright v. Westmoreland Cty., 443 F.3d 276, 281 (3d Cir. 2006) (such is required to make out a State-created danger claim under § 1983 and the Fourteenth Amendment).

Having determined that sufficient evidence exists that Holland and Vance's actions unreasonably precipitated Holland's use of deadly force in violation of Michael Wood's Fourth Amendment right to be free from unlawful seizure, the Court turns to whether the right that was violated was clearly established. To answer that question, a court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted. See Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007) ("The question at this second [Saucier] step is whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.'") (quoting Saucier, 533 U.S. at 202). "Officers who make reasonable mistakes as to what the law requires are entitled to qualified immunity." Green v. New Jersey State Police, 246 F. App'x 158, 162 (3d Cir. 2007). Thus, the right at issue is "clearly established" only if it would be unreasonable for officers to believe that Defendants' actions would not constitute excessive force. See id. at 163.

The Third Circuit and its District Courts have recognized, but not explicitly adopted, the theory "that conduct on the officers' part that unreasonably precipitated the need to use deadly force may provide a basis for holding that the eventual use of deadly force was unreasonable in violation of the Fourth Amendment." Grazier v. City of Phila., 328 F.3d 120,

127 (3d Cir. 2003). See also Neuburger v. Thompson, 124 F. App'x 703, 706

(3d Cir. 2005). Only months ago, the Circuit advised:

> Depending on the severity and immediacy of the threat and any
> potential risk to public safety posed by an officer's delayed
> action, it may be appropriate for an officer to retreat or await
> backup when encountering a mentally disturbed individual. It
> may also be appropriate for the officer to attempt to de-escalate
> an encounter to eliminate the need for force or to reduce the
> amount of force necessary to control an individual.

Johnson v. City of Phila., 837 F.3d 343, 353 (3d Cir. 2016). As such,

Plaintiff has not shown the violation of a constitutional right that was

clearly established at the time of the incident here. Summary judgment will

be granted as to the claims of excessive force, based on the theory that the

officers unreasonably precipitated the need to use deadly force, which have

been asserted against Sergeant Vance and Officer Holland in their

individual capacities in Count II.

**Officers Wilhelm and Cummings**

A § 1983 claim for the failure to stop the use of excessive force rises to

the level of a constitutional violation if excessive force was used and

defendants had a reasonable opportunity to prevent the use of excessive

force. See, e.g., Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).

The undisputed record demonstrates that neither Officer Wilhelm nor

Officer Cummings committed any constitutional violations. The record is

clear that they did not use force on Michael Wood, make decisions at the

scene, nor do anything to allegedly escalate the situation. Their interactions with the Decedent were extremely limited. Indeed, the officers were outside of the apartment for the majority of the relevant time period. Nothing in the record supports the theory that they had an opportunity to affect the actions of the officers inside the apartment. Accordingly, summary judgment will be granted as to the constitutional claims against Officers Wilhelm and Cummings in their individual capacities. Similarly, there is nothing in the record to keep these two officers in the case based on wrongful death or negligence, discussed below.

## **Municipal liability—failure to train**

Plaintiff's failure to train claim is based on the undisputed record evidence that neither the Borough of Bellmawr, nor the Borough of Brooklawn, provides its officers any training "on issues involving suicidal or barricaded individuals." (Opposition Brief, p. 20.) According to Plaintiff's expert, had the officers received training, they would have recognized the situation as a "suicide by cop" scenario, and thus they would not have brought Chris Wood into the apartment, and they would have vacated the apartment (i.e., "tactically disengaged") until the Critical Incident Team arrived. (Pl's Ex. H.) Further, Plaintiff contends, had this been done, Michael Wood would not have been shot by Officer Holland. (Id. at p. 27)

(opining that the officers' failure to tactically disengage "substantially contributed to and was a proximate cause of [Michael Wood's] death.").

Triable issues of fact exist as to whether the need for training in barricaded subject / suicidal subject situations was sufficiently obvious to constitute deliberate indifference. Plaintiff's Exhibit N, a "Training Key" published in 2007 by the International Association of Chiefs of Police, reasonably supports a finding that such situations will recur. Indeed, the very fact of the Training Key's existence supports an inference that barricade situations -- and specifically, situations where "officers are sent to check on the well-being of a subject who reportedly threatened suicide" (Pl's Ex. N at p. 2) -- occur with some regularity. Further, the Training Key states that, "[n]umerous cases have been documented in which officers responding to [threatened suicide] situations, with the best intentions, made decisions . . . that ended in unanticipated negative consequences." (Id.)  Additionally, Plaintiff's expert states that barricaded suspect and subject situations are "prevalent." (Pl's Ex. H, p. 24)

The Training Key also raises triable issues of fact as to whether, in such recurring situations, untrained officers will predictably violate citizens' constitutional rights. It states, "[t]o err by tactical intervention and the use of [deadly] force where in hindsight, it may have been better to extend negotiations, can have both personal and community consequences.

. . . For the protection of all parties concerned, such judgments must be removed from the realm of guesswork and subjected to pre-established criteria and sound professional judgment." (Id. at p. 3.)

Finally, the record raises triable issues of fact as to causation. Plaintiff's expert opines that the officers' failure to "tactically disengage" "substantially contributed to and was a proximate cause of [Michael Wood's] death." (Pl's Ex. H, p. 27.) If a jury accepts this opinion, it could reasonably find that, had Sergeant Vance and Officer Holland received training concerning barricaded and suicidal subjects, they would not have unreasonably created the need to use deadly force on Michael Wood.

Accordingly, as to the municipal liability claims against both Bellmawr and Brooklawn in Count I, summary judgment will be denied on Plaintiff's claim that in "suicide by cop" situations, it is highly predictable that untrained officers' interactions with a suicidal subject will result in the police shooting the subject in violation of the Fourth Amendment.

**Wrongful death / Negligence**

Summary judgment will be denied as to the State law wrongful death[13] and negligence claims asserted against the municipalities and

---

[13] Under the Wrongful Death Act, N.J. Stat. Ann. § 2A:31–1 to 6, the heirs of a person who has died by virtue of "a wrongful act, neglect or default" may assert a claim for their "pecuniary injuries," N.J. Stat. Ann. § 2A:31-1, -5.

Sergeant Vance and Officer Holland. In support of their motions for summary judgment on these claims, Defendants assert that "there is no evidence that the [Defendants] acted inappropriately in responding to the 911 call and in using deadly force on Mr. Wood." (Bellmawr Defendants' Moving Brief, p. 16)  As discussed above, this argument is contradicted by the record evidence, which contains disputed facts. Accordingly, summary judgment will be denied as to Counts III, V, and VI.[14]

### Negligent Entrustment/Negligent Hiring and Retention

It is not clear whether Plaintiff's negligent entrustment/negligent hiring and retention claims are State law claims or Monell claims. In any event, both theories fail for lack of evidence. See Brown, 520 U.S. at 412 (A Monell inadequate screening claim "must depend on a finding that th[e] officer was highly likely to inflict the particular injury suffered by the plaintiff."); Davis v. Devereux Foundation, 209 N.J. 269, 292 (2012) ("New Jersey courts recognize the tort of negligent hiring, where the employee either knew or should have known that the employee was violent or aggressive, or that the employee might engage in injurious conduct toward third persons."). Summary judgment will be granted to the municipalities on Counts VII & VIII.

---

[14] Count VI for Survival was not addressed by the parties.

## **<u>Conclusion</u>**

For the reasons stated above, and in keeping with the discussion held on the record during oral argument, Defendants' motions for summary judgment will be granted in part and denied in part. Remaining in the case are:

- the <u>Monell</u> claims in Count I against both municipalities;

- the portion of Count II that asserts a Fourth Amendment violation by Holland's use of deadly force;

- the State law claims in Counts III, IV, V, and VI against Holland, Vance, and both municipalities.

An Order will accompany this Opinion.

Dated: December 20, 2016                     /s/ Joseph H. Rodriguez
                                             Joseph H. Rodriguez, USDJ